[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The parties' marriage of approximately twenty years duration was dissolved by order of the court (Cohen, S.T.R.) on April 15, 1988. Thereafter, the parties presented a series of motions to the court addressing original child support and other financial orders. The subjects of the present disputes include the financial orders rendered on June 3, 1993[1] (Norko, J.), interim orders entered in effectuation of that decision, and certain aspects of the property distribution orders entered with and soon after the judgment of dissolution. The relevant motions include the following: the defendant's Motion for Contempt #167, claiming that the plaintiff failed to make payments against the child support arrearage and other obligations, as required by Judge Norko's orders; the defendant's Motion for Contempt #176, alleging that the plaintiff failed to provide the defendant with her due share of proceeds from the sale of marital property; the defendant's Motion for Contempt #177, claiming that the plaintiff failed to make payments against the child support arrearage and other obligations, as required by the interim court orders; the defendant's Motion to Open Judgments entered April 15 and November 29, 1988 #178; the plaintiff's oral Motion to Strike or Dismiss the Defendant's Motion to Open Judgments, asserting lack of jurisdiction;[2] and the plaintiff's Motion to Modify, scripted under date of July 18, 1996,[3] claiming that a change in circumstances requires amendment of prior financial orders. Through these motions, the parties effectively requested the court to review those circumstances which could have affected the plaintiff's obligations with regard to payment of the recognized support arrearage and other costs, as well as any factors that would, in equity, require a reassessment of previously-ordered real property assignments.
Agreeing with the defendant and concluding that it has jurisdiction over her motion to open judgment #178, the court has denied the plaintiff's oral request to dismiss this motion. Having thus considered the defendant's claims as raised through motion #178, the court finds the issues in favor of the plaintiff. The court finds the issues of contempt raised by motion #176 in favor of the plaintiff. The court has found the issues of contempt raised through motion #167 in favor of the defendant, and has imposed such orders as are necessary and appropriate to require the plaintiff to meet his obligations to CT Page 16455 the defendant in a just manner. The court has found the time-limited issues of contempt raised by motion #177 in favor of the defendant. The court has denied the plaintiff's motion for modification, finding these issues in favor of the defendant.
In the course of hearing these matters, the court was presented with witness testimony and voluminous documentary evidence. Each witness was subject to thorough, extensive and meticulous direct and cross-examination. The defendant was represented in these proceedings by skilled and experienced trial counsel. The plaintiff, acting pro se, was well-preserved and poised at each phase of the hearing. He appeared throughout as an intelligent, articulate individual, consistent with his previously active career as a businessman. The plaintiff consistently demonstrated that he was clearly familiar and comfortable not only with the application of the rules of practice in Connecticut courts, but with evidentiary principles and procedures as well.
In addition to the well-scripted motions he had submitted, the plaintiff filed a comprehensive and detailed memorandum in support of his positions relating to the multiple legal and factual issues presently before the court. The defendant would have the court rest on the evidence presented, and upon the documentary exhibits received as evidence and those used for demonstrative purposes at the hearing, in lieu of submitting a written memorandum.
In deciding these matters, the court has relied upon the applicable statutory criteria together with the equitable and tax consequences of the financial awards set forth below. In evaluating the evidence presented, the court observed the appropriate rules for assessing witness testimony. "`The question of the credibility of witnesses is for the trier to determine . . . Where testimony is conflicting the trier may choose to believe one version over the other . . . as the probative force of the evidence is for the trier to determine.'" (Internal citation omitted.) State v. Santiago, 245 Conn. 301,318, 715 A.2d 1 (1998); State v. Vargas, 34 Conn. App. 492, 498,642 A.2d 47, cert. denied, 230 Conn. 907, 644 A.2d 921 (1994). See also Shearn v. Shearn, 50 Conn. App. 225, 230-31,717 A.2d 225 (1998). The trier of fact may accept or reject, in whole or in part, the testimony of any witness. Smith v. Smith,183 Conn. 121, 123, 438 A.2d 1165 (1981). See also State v. Vargas, supra,34 Conn. App. 498; § 1.39 Credibility of Witnesses, Connecticut CT Page 16456 Civil Jury Instructions. "`[N]othing in our law is more elementary than that the trier is the final judge of the credibility of witnesses and of the weight to be accorded their testimony.'" (External citations omitted.) Smith v. Smith, supra,183 Conn. 123.
 I FRAUD
The defendant submits that this court has jurisdiction to open both the judgment of dissolution, entered April 15, 1988,[4] and certain provisions of the subsequent modification of that judgment, entered November 29, 1988.[5] Defendant's Motion to Open Judgment #178. While the plaintiff contests the defendant's assertion of the court's contemporary jurisdiction over these matters, "`once the question of lack of jurisdiction is raised, [it] must be disposed of no matter in what form it is presented . . . and the court must fully resolve it before proceeding further with the case. . . . Castro v. Viera,207 Conn. 420, 429, 541 A.2d 1216 (1988). The question of whether the court has such jurisdiction, however, must be informed by the established principle that every presumption is to be indulged in favor of jurisdiction. Laurer v. Zoning Commission,220 Conn. 455, 460, 600 A.2d 310 (1991).'" (Internal quotation marks omitted.) State v. Carey, 222 Conn. 299, 305, 610 A.2d 1147
(1992), on appeal after remand, 228 Conn. 487, 636 A.2d 840
(1994). Under the circumstances of this case, the court finds the issue of jurisdiction in favor of the moving party, the defendant. Accordingly, the court denies the plaintiff's oral motion to strike or dismiss the defendant's motion #178.
By way of procedural history, the original orders for support and real property division were imposed on April 15, 1988, at the time the parties' marriage was dissolved. The judgment of dissolution was derived from a stipulation presented by the parties and ratified by the court on that date. The resulting decree included the following relevant, stipulated provisions:[6] "Real property located at 71 Nassahegan Drive, Burlington, Connecticut,[7] and the adjoining lot shall remain with the Defendant Wife, as her residence, until sale, remarriage or at such time when the minor children reach the age of 18 years, whichever occurs first. Defendant Wife will not further encumber the property without the Plaintiff's permission which must be requested and given in writing. An existing mortgage on CT Page 16457 the aforementioned property held by the Plaintiff in the fact (sic) amount of $50,000 will be forgiven at the time of the sale assuming no further encumbrances are added by the Defendant. At the time the property is sold or when the youngest child reaches the age of 18 years, or remarriage, whichever occurs first, the property will be sold and the equity shall be shared equally."
On November 29, 1988, those original property distribution orders were modified by the court (T. Sullivan, J.), in response to the parties' stipulation for a reassignment of their real property.[8] As discussed below, neither party then raised any question concerning the court's authority to modify property distribution orders that had been entered as a part of an original decree.[9]
Notwithstanding the passage of time since the judgment of dissolution and the subsequent modification of property distribution orders, the court has considered the merits of the defendant's motion #178, as the resulting of her clear assertions that both the original and modified property distribution orders "were entered based upon fraud, threat, duress and/or coercion." Defendant's Motion to Open Judgment #178. Traditionally, it has been acknowledged that the trial court is without power to modify any orders for distribution or assignment of property assignments made at the time of dissolution, "even if there should be a change of circumstances."Grayson v. Grayson, 4 Conn. App. 275, 286, 494 A.2d 576, appeal dismissed, 202 Conn. 221, 520 A.2d 225 (1985). See General Statutes § 46b-81[10]; Bunche v. Bunche, 180 Conn. 285, 289,429 A.2d 874 (1980). Here, however, the defendant's counsel's vigorous, able arguments manifest her sincere claim that she was deprived of a reasonably meaningful opportunity to be heard at the time the dissolution was entered on April 15, 1988, as well as when the stipulation for modification was submitted to the court and approved on November 29, 1988. See Jenks v. Jenks,232 Conn. 750, 753, 657 A.2d 1107 (1995); Billington v. Billington,220 Conn. 212, 217-18, 595 A.2d 1377 (1991); Hill v. Hill,39 Conn. App. 258, 264, 664 A.2d 812 (1995), cert. denied,236 Conn. 920, 674 A.2d 1326 (1996). This claim formed an appropriate basis for the court to consider the limited issue of whether the defendant was, as alleged, subject to fraud, threat, duress and/or coercion at the time she was induced to enter into the stipulations which form the basis of the relevant property-division orders. CT Page 16458
In assessing these issues, the court has applied the fundamental principles which apply to the opening of matrimonial judgments under such circumstances. Generally, "[t]o conclude that a stipulated judgment resulted from duress, the finder of fact must determine that the misconduct of one party induced the party seeking to avoid the stipulated judgment to manifest assent thereto, not as an exercise of that party's free will but because that party had no reasonable alternative in light of the circumstances as that party perceived them to be." (Citations omitted.) Jenks v. Jenks, supra, 232 Conn. 753. "In making its factual determination whether a stipulated judgment should be opened, the court must inquire into whether the [judgment] was obtained by fraud, duress, accident or mistake. . . . A stipulated judgment . . . is not voidable on the ground that it was accepted with reluctance, so long as its procurement was not the result of fraud, duress, or mistake." (Quotation marks and citations omitted.) Jenks v. Jenks, supra. The elements of such a claim as that presented here would require the defendant to prove that: "(1) a false representation was made as a statement of fact; (2) the statement was untrue and known to be so by its maker; (3) the statement was made with the intent of inducing reliance thereon; and (4) the other party relied on the statement to his detriment." Billington v. Billington, supra,220 Conn. 217. See also Mitchell v. Mitchell, 31 Conn. 331, 336,625 A.2d 828 (1993). Thus, the court here has assessed whether the evidence established that the plaintiff, through act or omission, induced the defendant to enter into the stipulations which formed the basis of these orders, and whether the defendant stipulated to the judgments, not as an exercise of her free will, but because she had been left without a reasonable alternative, in view of the circumstances as she believed them to be. Jenks v.Jenks, supra, 232 Conn. 653, 754-755.
The defendant bore the burden of proving that the orders at issue were derived from fraudulent inducement on the part of the plaintiff Masters v. Masters, 201 Conn. 50, 56 (1986). It is axiomatic that a "party claiming fraud must satisfy a standard of proof more exacting than the probability standard generally applicable in civil cases. Alaimo v. Royer, 188 Conn. 36, 39,44 A.2d 207 (1982)." Pinder v. Pinder, 42 Conn. App. 254, 263,679 A.2d 973 (1996). The courts have used various terms to describe the burden of proof imposed upon the defendant insofar as this issue is concerned: only evidence that is "clear and satisfactory", "clear, precise and unequivocal", "clear and convincing", or "clear, convincing and unequivocal" will suffice CT Page 16459 to establish a claim of fraud. See, e.g., Pinder v. Pinder, supra, 42 Conn. App. 263; Meyers v. Cornwell Quality Tools, Inc.,41 Conn. App. 19, 34, 677 A.2d 444 (1996); Mitchell v. Mitchell, supra, 31 Conn. App. 336; Grayson v. Grayson, supra,4 Conn. App. 286-288.
 A ORDERS OF APRIL 15, 1988
Through her motion to open judgment #178, the defendant prayed the court to open the April 15, 1988 orders for real property distribution because these orders "were entered based upon fraud, threat, duress and/or coercion." The plaintiff countered that the court has no jurisdiction over these issues.[11] The plaintiff further asserted that the defendant knowingly and voluntarily entered into the agreements that formed the basis for these orders, and then intentionally placed these agreements before the court in anticipation of approval.
The court makes the following findings pertinent to this aspect of the defendant's claims of fraud:
The long record in this matter reflects that when the judgment of dissolution was entered on April 15, 1988, only the plaintiff was represented by counsel. The defendant then appeared pro se. The court's orders were based upon a signed stipulation that had been personally presented by both parties at the dissolution hearing. Although the defendant here claimed that she was uninformed about the contents or implications of the original decree, the evidence establishes that she had participated in the drafting of the parties' agreement during the weeks prior to this hearing, had obtained advice from legal counsel prior to entering into the stipulation submitted to court, was well aware that she was entitled to a trial of the issues raised through the plaintiff's complaint for dissolution of her marriage, and that she made a knowing and voluntary decision to proceed with an uncontested hearing of the dissolution action. Under all the circumstances here presented, and after a thorough hearing of the matter, the court finds that the defendant has failed to provide clear, convincing and unequivocal evidence that she entered into the orders which formed the basis of the original decree as the result of fraud, threat, duress or coercion.
In support of her claim of fraud underlying the original CT Page 16460 decree, the defendant provided the court with historical evidence relating to the parties' relationship prior to the breakdown of the marriage. The defendant was indeed dependent on the plaintiff during the course of the marriage, and feared her inability to exist independent of him. The plaintiff was demanding, and emphasized that the defendant's limited education was likely to constrain her success in the world of business. The defendant was a high school graduate who had attended one year of secretarial school. Throughout the marriage, the defendant served as the plaintiff's bookkeeper in his various endeavors. She had also performed executive secretarial work for the plaintiff and his various business enterprises, and was thus familiar with the language contained in commercial documents.[12]
The defendant testified concerning her mental health status. She had been treated by a psychiatrist in the mid-1970's, following the parties' marriage on June 1, 1968. After the birth of their son, Kevin, the defendant participated in family counseling with this child, over a number of years.[13] In 1987, at the time the parties separated, the defendant consulted with one of Kevin's counselors for her own needs. This mental health intervention was brief, without follow-up. The defendant received additional mental health counseling after the divorce. At the hearing, however, no testimony was adduced from any relevant mental health care provider concerning stress or duress the defendant may have experienced as the result of the breakdown of her marriage, her involvement with the plaintiff's business debt, the legal actions involving distribution of marital property, or the plaintiff's undue influence upon her. CompareJenks v. Jenks, supra, 232 Conn. 756 ("trial court reasonably could have inferred, from additional testimony presented by a mental health professional, that the defendant's will was overborne by the conduct [of the plaintiff husband] described by the defendant and her witnesses"). This aspect of the evidence was insufficient to fulfil the defendant's heavy burden of showing that the plaintiff's conduct, during and after the marriage, deprived her of the mental stability and emotional wherewithal necessary to fairly and appropriately evaluate the content of the stipulation underlying the original degree, or to voluntarily enter into such an agreement. Jenks v. Jenks, supra,232 Conn. 753.
The defendant also argued that her lack of legal representation at the time of the dissolution proceedings in and of itself established that she was coerced or forced into CT Page 16461 executing the stipulation that formed the basis of the April 15, 1988 orders. A party's access to legal counsel, in family matters, is but one of the criteria that a court must consider in determining whether a settlement that appears to have been "negotiated" was actually brought about through fraud, duress or coercion. The evidence in this matter disclosed that while the plaintiff had actively discouraged the defendant from engaging trial counsel or formally procuring legal assistance in connection with the dissolution proceedings, the defendant nonetheless had secured informal, but professional, consultation with an attorney whom she described as a "friend", prior to that hearing. Thus, while the defendant argued that she felt threatened and coerced into forgoing the opportunity to seek counsel, and that she signed the April 15, 1988 stipulation only because she feared repercussions from the plaintiff it is clear that the defendant possessed the fortitude which allowed her to deviate from the piaintiff's direction by obtaining pre-divorce advice and consultation, if not formal representation by an attorney. This aspect of the evidence again fails to support the defendant's claim of fraud. See Pinder v. Pinder, supra,42 Conn. App. 263.
The defendant further claimed that during the course of the marriage, the plaintiff obtained a series of loans in large amounts, for which he forced her to participate as a co-signor, using the Nassahegan Drive property as collateral. The defendant argued that at the time of the dissolution proceedings, she did not know what debts encumbered the Nassahegan Drive property, and that she therefore could not knowingly have entered into the stipulation presented to the court on April 15, 1988. The court attributes little weight to this claim, which is inconsistent with the defendant's acknowledgment that she executed the many loan documents which had resulted in liens against the property, and inconsistent with her position as the plaintiff's bookkeeper for each of his business endeavors. In fact, the defendant candidly admitted that prior to the parties' divorce in 1988, she was aware that there were significant liens outstanding on the Nassahegan Drive property, and admitted that she knew that the many lienholders claiming an interest in the Nassahegan Drive property included United Bank, Hartford National Bank, and Cititrust, as well as the plaintiff.[14] While the defendant denied then knowing exactly how much was owed to her creditors, she also had acknowledged consultation with a bankruptcy attorney prior to the commencement of the dissolution proceedings. The court cannot credit the defendant's claim of innocence concerning CT Page 16462 knowledge of the significant debt encumbering the Nassahegan Drive property at the time of the divorce. See Billington v.Billington, supra, 220 Conn. 217.
In addition, at the time of the dissolution proceedings, the defendant was no stranger either to litigation or to the distressed condition of the Nassahegan Drive property. When she acceded in the terms of the divorce decree, the defendant knew that the Nassahegan Drive property was likely to bring little value at sale, absent a change in circumstances. The house was notably expensive to maintain, and the property was affected with a significant problem concerning provision of water service: water pressure was chronically low due to inadequate wells, and volume was markedly reduced below that required to service the premises.[15]
The transcript of the dissolution proceedings on April 15, 1988 reveals no indication that the defendant was under duress, threat or coercion at that time. The defendant admitted that she well-understood the content and import of Judge Cohen's inquiries and actions on April 15, 1988, although she was not then represented by counsel; she fully acknowledged that she understood what the judge had asked of her, and that she answered his inquiries knowingly and intelligently. The defendant further admitted that her mental processes were not then impaired in any way at any time related to that hearing. While the parties' financial affidavits, filed on that date, indicate that the plaintiff's income was far greater than that of the defendant, she held sole title to the Nassahegan Drive property, which was represented as having value of $325,000 less an outstanding mortgage in the amount of $90,000.[16] The evidence does not support a finding that the plaintiff intentionally misstated the value of the real property at issue, nor that he had alone actual knowledge that the property carried less equitable value than that set forth on the defendant's affidavit: rather, the financial affidavits, and the parties' stipulation, reflect the defendant's intention to take full advantage of her access to current use of the property, and an equal distribution of profits from its sale under the agreed terms, while benefiting from substantial, although term-limited, support payments.
Taken as a whole, the court finds that the evidence related to the real property distribution orders of April 15, 1988 falls short of meeting the stringent criteria set by our courts for opening and setting aside judgments based upon fraud, duress or CT Page 16463 coercion. The defendant has failed to produce clear and convincing evidence to support her claim that the plaintiff's misconduct induced her into manifesting assent to the stipulated judgment: although the plaintiff discouraged her from seeking legal counsel, the record clearly reflects that the defendant felt sufficiently confident and personally secure to permit her to obtain a consultation before proceeding. There was insufficient evidence from which the court could reasonably conclude, clearly and unequivocally, that the defendant entered into the original stipulation merely because she had been the subject of a series of intimidating ultimatums from the plaintiff, and that she therefore wished "`to get it over with.'" Compare Jenks v. Jenks, supra, 232 Conn. 754. Despite the defendant's persistent and vigorous protestations, the record does not reflect clear and convincing evidence that "[t]he parties conducted their settlement negotiations in an atmosphere of mutual distrust and suspicion." Compare Billington v.Billington, supra, 220 Conn. 215. No independent witnesses, unrelated to the dispute, provided the court with evidence from which it could conclude that the defendant was subject to duress contemporaneous with the execution of the stipulated agreement, or to specific threatening and coercive behavior. Compare Jenks v.Jenks, supra, 232 Conn. 755, 756.
As she has not met her burden of proving, by clear and convincing evidence, that the original judgment of dissolution was based upon "fraud, duress or coercion," the defendant cannot prevail upon this issue, and the judgment of April 15, 1988 shall remain unopened and intact. Accordingly, this aspect of the defendant's motion to open judgment #178 is hereby denied.
 B ORDERS OF NOVEMBER 29, 1988
Through her motion to open judgment #178, the defendant claimed that the orders of November 29, 1988, which amended the original real property assignment, should be opened and modified, as these orders were also "entered based upon fraud, threat, duress and/or coercion." Both parties had relied upon the effect of the November 1988 stipulation in conducting their post-judgment affairs. At the hearing, the defendant claimed that this reliance had deprived her of the meaningful real property distribution to which she was entitled, all to her detriment. In response, the plaintiff again argued that the court had no CT Page 16464 jurisdiction over the issues, and that both parties had entered into the November 1988 stipulation knowingly, intentionally, and with a full understanding of the implications and legal effect of the court's entry of orders ratifying that stipulation. The court finds jurisdiction over these issues for the reasons stated above, and denies the plaintiff's oral motion to strike or dismiss the defendant's motion #178.
The court finds the following additional facts pertinent to this aspect of the defendant's claims of fraud:
On November 29, 1988, the parties joined in presenting the court with a new stipulation, modifying the property and support awards that had been entered on April 15, 1988. This event was preceded by the defendant's formal consultation with several attorneys. In early October 1988, Atty. Richard Liebert had performed a title search of the Nassahegan Drive property, at the defendant's request. Upon discussion with Liebert and another lawyer-friend, the defendant had secured the services of Atty. Leon Kaatz to represent her in further proceedings before the family court.[17] Thus, in addition to the benefit of Liebert's advise and counsel concerning options for financial reorganization or bankruptcy at the time the November 1988 stipulation was submitted to the court, the defendant was represented by Kaatz, a skilled and experienced trial lawyer.
In November of 1988, assisted by Atty. Kaatz, the defendant participated in renegotiation of the property distribution and other aspects of April 15, 1988 decree. Following the dissolution of the parties' marriage, the defendant had paid all outstanding mortgages on the Nassahegan Drive property for a limited period of time, but had found this practice unduly burdensome and beyond her financial capacity. The defendant was aware of and approved Kaatz's identification of $567,288 in debt on the Nassahegan Drive property at that time. Given her access to this information, the defendant was clearly subject to the inference that any equitable value in the property would reasonably exist only on paper.
The stipulation of November 1988 was drafted by the parties and in conjunction with their counsel. At the hearing on November 29, 1988, the court was presented with notarized financial affidavits which now demonstrated, inter alia, a substantial decrease in both the plaintiff's stated income and the defendant's position with regard to the Nassahegan Drive property: this real CT Page 16465 estate, ostensibly having a net worth exceeding $200,000 on April 15, 1988, was represented on November 29, 1988 to have an estimated retail value of $425,000, but a negative equitable value, due to encumbrances in the amount of $567,288. Substantial debts, secured in full or in part by the Nassahegan Drive property, were identified by the defendant as being due to commercial lenders such as Hartford National Bank, United Bank and Trust, Connecticut National Bank, and Cititrust. In addition, the defendant's financial affidavit identified her extant $50,000 debt to the plaintiff, as specified in the April 15, 1988 orders.
The November 1988 stipulation prescribed a substantial decrease in both the alimony and child support payments to be made by the plaintiff to the defendant, who remained primary custodian of the parties' two minor children. The November 1988 stipulation decreased the alimony payments to $700 per month, and also reduced the plaintiff's current child support obligation to $800 per month. The stipulation further directed that "[t]he defendant shall sell the premises known as 71 Nassahegan Drive, Burlington, Connecticut and the adjoining lot", and designated that the plaintiff's obligation to pay alimony would cease when this property was sold. Orders of November 29, 1988. After the sale, the net proceeds were to be divided, with seventy-five percent of any proceeds directed to the defendant, and twenty-five percent to the plaintiff This allocation thus represented a significant convergence from the real property assignment set forth in the orders of April 15, 1988, which directed that any proceeds produced by sale of the property were to be distributed equally to the parties.
When the stipulation was presented to the court on November 29, 1988,[18] Judge Sullivan conducted a complete and thorough canvass of the parties. The defendant has admitted that she entered into the November 29, 1988 stipulation voluntarily, knowingly, and with attendance, assistance and counsel provided by Kaatz. The defendant further admitted that she understood the content and import of Judge Sullivan's canvass and orders on November 29, 1988. While she felt pressure from her financial circumstances, the defendant clearly understood that she was entitled to a hearing on the subject of the proposed modification of property distribution orders. She elected not to proceed with the hearing, finding the newly proposed property assignment to be in her best interests, under all the circumstances then existing, which included her knowledge of the extraordinary amount of debt which burdened the real estate at issue. CT Page 16466
Time did not bear out the defendant's expectations of a substantial financial benefit from sale of the Nassahegan Drive property. However, taken as a whole, the defendant's evidence fails to meet the required legal standard for establishing that her entry into the November 1988 stipulation was anything but knowing, voluntary and intentional. Notwithstanding the present contentiousness of the parties and the defendant's concerns about the bias she perceived on the part of Kaatz,[19] the evidence presented could not reasonably support a conclusion that in November of 1988, settlement discussions were conducted in an atmosphere of mutual distrust or suspicion. Compare Billington v.Billington, supra, 220 Conn. 215. Rather, with the tutelage of counsel, and with the prospect of improving her own financial status and that of her children, the defendant adopted the stipulation in anticipation of continued benefit therefrom.
The defendant has thus failed to meet her burden of proving, by clear and convincing evidence, that the misconduct of the plaintiff, his counsel or his agents, induced her to manifest assent to the stipulation of November 1988 or the court orders that followed therefrom. The defendant has failed to establish that she entered into either the stipulation or accepted the orders of November 29, 1988 because she had no reasonable alternative in light of the circumstances as she perceived them to be, not as an exercise of her free will upon the advice of counsel, but as the result of fraud, threat, duress and/or coercion brought about by the plaintiff. See Jenks v. Jenks, supra, 232 Conn. 753; Billington v. Billington, supra,220 Conn. 217. As the defendant has not met her burden of proving, by clear and unequivocal evidence, that the judgment of November 29, 1988 was based upon "fraud, duress or coercion," she cannot prevail upon this issue, and the judgment of November 29, 1988 shall remain unopened and intact. Accordingly, this aspect of the defendant's motion to open judgment #178 is hereby denied.
 II DISTRIBUTION OF PROCEEDS FROM SALE OF NASSAHEGAN DRIVE PROPERTY
Through her motion for contempt #176, the defendant has asked the court to find that the plaintiff wilfully violated the November 29, 1988 orders, in that "Donald D. Bowers has completely failed and neglected to pay Florence I (Bowers) Keegan CT Page 16467 seventy-five (75%) of the net proceeds produced from the sale of 71 Nassahegan Drive." Defendant's Motion for Contempt #176. As relief, the defendant requested the court to order the incarceration of the defendant until he had complied with this obligation.
The court notes that the terms of Judge Sullivan's orders required the defendant to sell the Nassahegan Drive property, and that she accomplished this task. The defendant's claims derive, however, from her contention that she was forced to sell the Nassahegan Drive property when it was over-burdened with debt not of her making. She has further asserted that the sale of the property to a trust whose beneficiary was the plaintif'fs successor wife, Deborah Bowers, constituted a fraudulent transaction which effectively created a constructive trust on behalf of the plaintiff. Finally, the defendant argues that Atty. Brian Carey, apparently acting as trustee for Deborah Bowers, was actually serving as the agent of the plaintiff throughout the course of real estate transfers involving the Nassahegan Drive property. The defendant's thorough and analytical presentation of evidence related to these transactions, although exhaustive in nature, failed to satisfy her legal burden of proving that the plaintiff had acted wilfully, in purposeful violation of court orders. Cologne v. Westfarms Associates, 197 Conn. 141, 151-52,496 A.2d 476 (1985).[20] See also Issler v. Issler,50 Conn. App. 58, 66-67. 69.716 A.2d 938, cert. granted in part,247 Conn. 919, 722 A.2d 810 (1998). As the court finds that the defendant has failed to prove, by either a preponderance of or by clear and convincing evidence, that the plaintiff actually or constructively received funds from the sale of this property and/or that he failed to distribute such sums, motion #176 is found in favor of the plaintiff
The court makes the following additional findings pertinent to this aspect of the defendant's claims of contempt:
The defendant had purchased the Nassahegan Drive property in her name alone in 1979, during the course of her marriage to the plaintiff. The defendant admitted that during the first part of 1989, she remained without the financial ability to maintain payments on the primary and additional loans secured by the property. Between April 15 1988 and July 1989,. she had tried, without success, to market and sell the Nassahegan Drive property. Even the defendant's reduction of the listing price, from $350,000 to $250,000, failed to achieve a sale. CT Page 16468
In early 1989, the Deborah Bowers Grantor Trust had been created for the benefit of the plaintiff's wife, Deborah Bowers,[21] with Carey appointed as the primary trustee. Carey was a friend, counsel to and associate of the plaintiff: he had served as the plaintiff's attorney in connection with the orders of November 29, 1988. On July 26, 1989, in fulfillment of the transfer obligations imposed by the orders of November 29, 1988, the defendant quitclaimed her interest in the Nassahegan Drive property to Carey, acting in his capacity as trustee for the Deborah Bowers Trust.
Carey attended the closing, and provided credible testimony concerning the circumstances of the transactions on July 26, 1989. In consideration for the transfer of the Nassahegan Drive property, the defendant was relieved of her obligation to honor all outstanding commercial debt secured by this real estate.[22] The defendant was also relieved of an obligation to honor the personal mortgage held by the plaintiff, which had been the subject of the April 15, 1988 orders. As additional consideration, the defendant received a cash payment of $20,000, tendered to her at the closing.[23] This amount was paid by Carey, using monies obtained from Deborah Bowers and her family. Deborah Bowers's family had also extended some funds which were used by Carey to stave off the foreclosure and other civil proceedings which had jeopardized the Nassahegan Drive property during 1989.[24]
The defendant acknowledged that when she quitclaimed the Nassahegan Drive property to Carey, she had considered her options, and concluded that loss of this real estate would be outweighed by the benefit of eradicating her obligation to defend against the many potential foreclosures and lawsuits likely to be brought against her by the commercial creditors. The defendant's concerns about the quitclaim and debt-transfer arrangement arose from Carey's subsequent profitable transfer of the Nassahegan Drive property to a third party less than five months later. On December 8, 1989, acting in his trusteeship capacity, Carey sold the Nassahegan Drive property for a gross amount of $320,000. From the profits of this transfer, Carey was able to fully discharge the commercial debt remaining upon the Nassahegan Drive property: on December 8, 1989, negotiated compliance payments were accepted by the remaining lienors; closing costs were covered; and Carey received five thousand dollars in attorneys' fees.[25] Approximately $212,000 net was received on behalf of CT Page 16469 the Deborah Bowers trust, from which approximately $67,000 was distributed to discharge the property-protecting loans extended by Deborah Bowers and her family.
The defendant views this net profit, although attributable to the trust, as a windfall to the plaintiff which was obtained at her expense. She argues that the court should infer that there was fraud in the sale of the Nassahegan Drive property, due to Carey's status in these transactions: she claims that because Carey represented the defendant in connection with the November 29, 1988 orders, and because he also represented the Deborah Bowers trust when that entity purchased and sold the Nassahegan Drive property in 1989, these events constitute sham transfers as a matter of simple fact. She further claims that because the plaintiff held the status of a contingent trustee pursuant to the terms of the Deborah Bowers trust, the court must recognize his role as the mastermind of the financial transactions which resulted in the defendant's loss of funds.
Such analysis belies the significant and uncontested fact that the defendant had been, with the plaintiff, a signator to the burdensome loans which had been secured using the Nassahegan Drive property as collateral. The defendant's proposition as well neglects the insufficiency of the facts, despite the defendant's tenacious presentation of evidence related to this topic, from which the court could reasonably have concluded that Carey acted with any purpose other than to fulfil his fiduciary obligation to the trust.
Despite her vociferous claims of foul play and her thorough presentation of evidence concerning the real estate transactions at issue, the court finds that the defendant has failed to meet her burden of proving, even by a preponderance standard, that the Deborah Bowers trust's purchase of the Nassahegan Drive property, and its subsequent profitable sale and relief of the overwhelming debt affecting that property, were caused by the wilful intervention, misrepresentation or malfeasance on the part of the plaintiff. While the evidence objectively establishes that an independent entity, the Deborah Bowers Trust, was enabled to acquire the Nassahegan Drive property in its distressed state, as the result of her quitclaim to Carey, she has failed to to produce any more than inuendo as proof that that the plaintiff caused this transfer to occur, or that he received a direct or measured benefit from the transaction. CT Page 16470
From the defendant's evidence, it is reasonable to infer that the plaintiff received an indirect benefit from the Deborah Bowers trust's profitable sale of the Nassahegan Drive property to a third party, as his wife was the beneficiary of that trust. However, the defendant has failed to show that the plaintiff himself actually acquired funds through this transaction, or that a constructive trust was established on his behalf through Carey's actions. A careful review of the exhaustive evidence relating to these transactions leads to the conclusion that the parties had jointly entered into a series of ill-fated commercial loans prior to the dissolution of their marriage; that they had voluntarily offered the Nassahegan Drive property as collateral for these loans, expecting a benefit in return; that each party anticipated reaping financial gain through the use of the monies thus procured were put; and they jointly suffered as the result of the failed business endeavors which precluded them from using any source, other than the Nassahegan Drive property, to redeem the loans.[26]
The very basis of the defendant's motion for contempt #176 requires proof that the plaintiff had access to net proceeds produced from the sale of the Nassahegan Drive property, which he could have distributed. As the defendant has failed, even by a preponderance of the evidence, to show that the plaintiff was able to distribute such funds, or that he wilfully withheld payment of monies due to her from the sale of this property, she has not met her burden of proof on this issue. Mallory v.Mallory, 207 Conn. 48, 57, 539 A.2d 995 (1988). Therefore, the defendant's motion for contempt #176 is denied.
 III NONPAYMENT OF CHILD SUPPORT ARREARAGE, COSTS AND FEES
The remaining motions emanate from Judge Norko's outstanding orders establishing the plaintiff obligations to pay the designated child support arrearage and costs, and interim compliance orders issued by this court in aid of that judgment.Gentile v. Ives, 163 Conn. 281, 282, 303 A.2d 720 (1972). Specifically, the defendant's motion for contempt #167 asserted that the plaintiff failed to comply with the orders of June 3, 1993; the defendant's motion for contempt #177 claimed that the plaintiff failed to comply with interim compliance orders issued March 26, 1996; and the plaintiff's motion for modification, CT Page 16471 submitted under date of July 18, 1996, alleged a change in circumstances which rendered him unable to comply with the financial orders at issue. The court finds the issues presented through the plaintiff's motion for modification in favor of the defendant, and denies that motion. The court resolves finds the issues presented through motions #167 and #177 in favor of the defendant, and finds the plaintiff in contempt.
In deciding these matters, the court has relied upon the principles relevant to assessing a party's capacity to honor support orders. It is axiomatic that in the context of family matters, "[e]arning capacity . . . is not an amount which a person can theoretically earn, nor is it confined to actual income, but rather it is an amount which a person can realistically be expected to earn considering such things as his vocational skills, employability, age and health." Lucy v. Lucy,183 Conn. 230, 234, 439 A.2d 302 (1981). See also Schmidt v.Schmidt, 180 Conn. 184, 189-190, 429 A.2d 470 (1980); Carey v.Carey, 29 Conn. App. 436, 440 (1992). In appropriate circumstances in family matters, "a trial court may base its financial awards on the earning capacity rather than the actual earned income of the parties. . . . Such circumstances include those where there is evidence that a party voluntarily quit or avoided employment in his or her field of expertise and where there is evidence of that party's previous earnings." (Internal citations omitted; citations omitted.) Paddock v. Paddock,22 Conn. App. 367, 371 577 A.2d 1087 (1990). See also, Lucy v. Lucy, supra, 183 Conn. 234. The court may base such financial orders on a determination of earning capacity, rather than actual earnings, even if there is no showing that avoidance of gainful employment was wilfully accomplished for the purpose of reducing an obligation to pay support. See Wilkens v. Wilkens,10 Conn. App. 576, 580, 523 A.2d 1371 (1987). Any award of support, based on a party's capacity to earn income, "requires that party to continue to work or find other sources of income to meet the obligations of the court's order." See Lawler v.Lawler, 16 Conn. App. 193, 204, 547 A.2d 89, appeal dismissed on other grounds, 212 Conn. 117,561 A.2d 128 (1988).
The pertinent motions fundamentally call into question the plaintiff's capacity to earn or accrue income and to comply with the June 3, 1993 orders for payment of the arrearage, fees and costs. See Mallory v. Mallory, supra, 207 Conn. 57. Generally, where a party is in arrears with regard to unpaid support CT Page 16472 obligations, the court may consider the financial circumstances of the obligor when determining ability to pay an arrearage, and the manner in which the arrearage may be paid. Moore v. Moore,187 Conn. 589, 590, 447 A.2d 773 (1992). Where appropriate, our courts have approved orders for lump sum or installment payments of a past-due arrearage. LaBow v. LaBow, 13 Conn. App. 330, 350,537 A.2d 157, cert. denied 207 Conn. 806, 540 A.2d 374 (1988);Friedly v. Friedly, 174 Conn. 279, 281, 386 A.2d 236 (1978). While evidence of the liquidity of a party's assets may be relevant to the subject of his or her ability to pay an arrearage, the court must also consider an offending party's ability to earn income when fashioning remedial orders in response to the finding of a wilful failure to comply with court's orders. See Mallory v. Mallory, supra, 207 Conn. 55-56. Accordingly, in addition to considering the plaintiff's actual earnings, income history and assets, the court in this matter has also evaluated the plaintiff's capacity to earn or to otherwise acquire funds which would reasonably be available to pay the amounts due to the defendant. Lucy v. Lucy, supra, 183 Conn. 234.
 A ORDERS OF JUNE 3, 1993
The orders of June 3, 1993, which form the focus of the first aspect of the defendant's motion for contempt #167, follow from the court's determination that the plaintiff then owed the defendant a substantial child support arrearage, plus costs and attorney's fees.[27] The defendant acknowledged the constraints of these orders through the text of her motion for contempt #167, which reiterated the court's finding of a child support arrearage totaling $11,844 and the imposition of orders to pay the defendant counsel fees in the amount of $5,055 and costs of $919.93. The defendant conceded that on June 3, 1993, the court had suspended its orders for payments to be made against the arrearage until any of the following conditions occurred: "`untilthe Plaintiff receives unemployment compensation, disabilityinsurance, or finds a new job. In the event of any of the above activities, the Plaintiff is to notify the Court of the amount of income and to provide an affidavit supporting his income\job. . . .'" (Emphasis added.) Defendant's Motion for Contempt #167. In addition, the motion recited the court's order that "`any and all payments the Plaintiff receives from thebankruptcy of TAI Industries be used to pay the arrearage to theDefendant'" and that the plaintiff was to make payment against CT Page 16473 the established amount of costs and attorneys fees "`at the rate of $100.00 per month once the Plaintiff is employed.'" (Emphasis added.) Id. As relief, the defendant requested the court to adjudge the plaintiff in contempt and that he be "punished therefore." Id.
The defendant has claimed that the plaintiff wilfully violated the terms of Judge Norko's orders by failing and refusing to make payments as ordered. The plaintiff admitted having failed to make payments in compliance with Judge Norko's rulings, notwithstanding his awareness of his obligations. He argued, however, that his lack of employment, lack of disability insurance payments, and failure to receive any proceeds from bankruptcy proceedings involving TAI Industries render him without obligation to make the ordered payments.[28] In response, the defendant contended that the plaintiff has sequestered or hidden the funds he acquired through these bankruptcy proceedings; that he has indeed obtained employment, but has diverted or hidden his income by passing it through his current wife, Deborah Bowers, whom he married on February 18, 1989; and/or that he violated Judge Norko's orders by wilfully withholding from the defendant funds which could have been used to fulfill the judgment.
While the text of the June 3, 1993 orders reference certain circumstances which should trigger the plaintiff's payment obligations, the court finds that these orders clearly and meaningfully established that when the plaintiff acquired funds, through any source such as unemployment compensation, disability payments or wages, or through a lump sum distribution, he was then to pay the defendant that amount which had been adjudicated as the sum due. While the orders of June 3, 1993 suspended the plaintiff's child support order until, inter alia, he "finds a new job", there was no express permission established in these orders through which the plaintiff would be relieved of his duty to ever compensate the defendant for the established child arrearage and other sums due to her. A fair reading of the orders of June 3, 1993 must acknowledge an expectation that the plaintiff would make reasonable efforts to find employment, for the orders contain the explicit language imposing upon him the responsibility of notifying the court of any income and/or job, so that the court could follow through with the issuance of a wage execution to secure the judgment.[29]
The plaintiff has been content to rest upon his assertions CT Page 16474 that because he has never become effectively employed, has never received unemployment or disability insurance payments, and has never received any monetary distribution from the bankruptcy proceeds of TAI Industries, Inc., he has no obligation to pay the defendant. Such a construction of Judge Norko's orders is disingenuous and avoids the court's obvious conclusion in June 1993: that when the plaintiff has funds available to cover the amount due to the defendant, he should pay her that amount available and should do so with dispatch.
The court finds the following additional facts pertinent to this aspect of the defendant's claims of contempt:
The plaintiff became aware of the content of the June 3, 1993 orders when he received a copy of the court's memorandum of decision in mid-July of that year. At that time, the plaintiff knew that the child support arrearage had been established at $ 11,844 and that he had a duty to pay this arrearage to the defendant, plus the identified amount of costs and fees. He calculated that his duty to pay was suspended until any of above-referenced specific conditions occurred, and that he had no further obligations under these orders.
During the relevant time periods following the issuance of the June 3, 1993 orders, the plaintiff received neither unemployment compensation or disability payments. Although he had occasional temporary employment as a tutor or laborer, he held no remunerative job for any measurable period of time. The court finds that instead of earning income, which would have enabled him to compensate the defendant, the plaintiff was content to rest upon any wages earned by his current wife, who had been the predominant source of his financial support during this time period. The plaintiff affirmatively stated that he has not been required to pay a penny for his daily care: shelter, food, gasoline, automobile repairs and medical attention were all paid for, in unspecified amounts, by Deborah Bowers.[30] During the time periods before the court, the plaintiff had paid the defendant a total of $ 1,087.22, representing a fraction of the total amount assessed against him by Judge Norko through the orders of June 3, 1993.
 1 EFFECTS OF BANKRUPTCY AND OTHER PROCEEDINGS
CT Page 16475 INVOLVING THE PLAINTIFF'S BUSINESS ENDEAVORS
In an effort to establish proof of the plaintiff's past and current financial resources through which the June 3, 1993 orders could have been fulfilled, the defendant presented an exhaustive, penetrating evidentiary review of the plaintiff's commercial activities. These activities included a long history of employment and uncompensated work with multiple corporations involved in sales, marketing and service of equipment used in the telecommunications industry. The defendant's close inquiries indicated her contention that the plaintiff has intentionally engaged in a persisting pattern of relationships with interrelated shell corporations, banks and financial institutions, agencies, franchise arrangements, and with specific individuals, all in an effort to hide assets and income from her, and all in an attempt to avoid honoring the obligations imposed upon him by Judge Norko and this court.[31] Despite the defendant's protestations to the contrary, these corporations were shown to be financially unprofitable and commercially unsuccessful endeavors so far as the plaintiff was concerned, resulting in corporate dissolutions and bankruptcies in various states. Notwithstanding the defendant's vigorous efforts, a close review of the evidence reveals no measurable monetary profit or intangible gain from the plaintiff's association with these corporations.
The defendant's case focused upon the proposition that because the name "Technical Acoustics" or "TAI" was attached to most of the business entities with which the plaintiff was involved during this period, the court should acknowledge that he used these multiple corporations to hide his personal assets. The plaintiff and the parties' son, Lonny Bowers, provided testimony concerning the various permutations of the plaintiff's commercial and business endeavors. Despite the defendant's thorough and intensive examination of these witnesses, the evidence failed to disclose a reasonable likelihood that the defendant had ever obtained measurable financial reward from his involvement with the various generations of the "TAI" enterprises, or that he had sequestered financial resources during the time in question.
In addressing these issues, the court has paid heed to both direct testimony from witnesses and circumstantial evidence. "The law . . . makes no distinction as to the probative force of direct and circumstantial evidence; the trier is free to give each the weight it deserves. State v. Gunning, 183 Conn. 299, CT Page 16476 312, 439 a.2d 339 (1981); State v. Chetcuti, 173 Conn. 165, 172,377 a.2d 263 (1977)." C. Tait and J. LaPlante, Connecticut Evidence (2d Ed. 1988) § 8.2.2, p. 230. In addition, "[a] trier is entitled to draw all reasonable and logical inferences based on the facts proven." (Citations omitted.) Id., § 8.2.1, p. 229. The court has also adhered to the precept holding that "[d]isbelief is not the equivalent of proof. Thus if a witness testifies to `white,' and the trier disbelieves that witness, it is not permitted to find `black' without affirmative evidence to that effect." (Emphasis added; external citations omitted.) C. Tait and J. LaPlante, supra, § 8.2.4, p. 230.
Accordingly, the court finds the following additional facts, pertinent to this aspect of the defendant's motion for contempt:
The plaintiff had formerly worked as a sales executive and principal associated with a Connecticut corporation known as Technical Acoustics Inc., or "TAI". TAI was in the business of providing sales and services for telecommunications enterprises. This company declared bankruptcy, without any profit redounding to the benefit of the plaintiff. In 1986, all of the stock previously issued by TAI was acquired by BOZAK, Inc. BOZAK, Inc. also acquired all assets that had been held by TAI, including inventory, component parts for commercial electronics, and equipment for use in teleconferencing and telecommunications technology support.
The plaintiff was assigned forty per cent of the shares issued by BOZAK, Inc., and subsequently received additional stock distributions. In late 1988, BOZAK, Inc. was dissolved to pay off its creditors, including the plaintiff who was owed approximately $ 100,000 by this corporation. As BOZAK, Inc. lacked funds to pay this debt, the plaintiff took back the assets originally obtained by BOZAK from TAI at the time of its dissolution. The assets were acquired in the name of a new company, Technical Acoustics, Incorporated. The tangible assets thus acquired by the plaintiff were valued at $ 25,000; the inventory of outstanding work contracts that had been originated, but were unfulfilled, was generously valued at approximately $ 360,000.
Technical Acoustics, Incorporated, failed to thrive, as well. In October 1991, most of the assets held by Technical Acoustics, Incorporated were sold to an individual named Allan Grey, who had organized a company known as TAI Industries, Inc.: the plaintiff retained a small, unmeasured portion of the inventory and CT Page 16477 outstanding contracts. While the value of the sold assets was not clearly established, the plaintiff had anticipated that this new corporation, TAI Industries, Inc. would pay him $ 145,000 in exchange for the asset transfer. The plaintiff was awarded a secured interest in TAI Industries, Inc., although the value of this interest was not effectively established. The plaintiff's expected payment was never received, as in late 1992, TAI Industries, Inc., too, filed for bankruptcy. The plaintiff was able to purchase the remaining tangible assets of TAI Industries, Inc. on October 1, 1993 for $ 3,500. The evidence did not adequately establish the source of funds used for this purchase.
The plaintiff was also involved in the organization of yet another corporation, TAI Systems, Inc., which had been founded in May of 1993. Although the plaintiff had contributed a significant sum to this corporation's start-up costs, the evidence did not adequately establish the source of funds used for this purpose. Remarkably, although the plaintiff had served as the president of this organization, he was unable to provide the court with any information concerning the gross or net income of TAI Systems, Inc. during 1993, 1994 or 1995, nor concerning any information this corporation may have provided to the Internal Revenue Service through tax filings during these periods. Nonetheless, as the court was not provided with any third-party information concerning TAI Systems, Inc.'s income, and there was insufficient evidence presented from which the could infer that the company had earned any particular amount of money during those years. C. Tait and J. LaPlante, supra, § 8.2.4, p. 230.
Like the other eponymous corporations, TAI Systems, Inc. was in the business of providing equipment, service and support for work in the telecommunications field. In anticipation that he would eventually receive an equity share in TAI Systems, Inc., the plaintiff had opted to forgo any compensation for his services as a salesman and manager, requiring TAI Systems, Inc. only to reimburse his expenses. While the plaintiff eventually did become the owner of a percentage of TAI Systems, Inc. stock, there was insufficient evidence from which the court could conclude what value, if any, the plaintiff's shares may have represented. Like the plaintiff's other businesses, TAI Systems, Inc. did not flourish, and wound down its business over time without demonstrated benefit to the plaintiff.
The defendant presented a plethora of facts in her effort to show that the plaintiff acquired income or valuable assets CT Page 16478 through his work with the variously named TAI/Technical Acoustics businesses: however, a careful review of this evidence fails to provide the court with sufficient basis for inferring that the plaintiff achieved any personal gain through these associations. In his work with these companies, the plaintiff was not shown to have acquired either measurable salary or bankruptcy distributions. He was not shown to have ever obtained anything but a virtually worthless ownership in any stock issues or franchise arrangements related to these commercial endeavors. In addition, the court was not provided with any expert opinion concerning the value of the plaintiffs skill's, self-training, or work experience as a salesman or manager in the field of telecommunications.
Where charges of contempt have been raised, the court must not yield to speculation, even in the face of the plaintiff's clearly convoluted and obfuscatory business relationships.[32]
"In order to constitute contempt, a party's conduct [in failing to comply with a court order] must be wilful. Connolly v.Connolly, 191 Conn. 468, 483, 464 A.2d 837 (1983)." Eldridge v.Eldridge, 244 Conn. 523, 529, 710 a.2d 757 (1998). After a thorough analysis of all the evidence presented on the issue of bankruptcy and other proceedings involving TAI Industries, Inc. and related entities, the court finds that the defendant has not met her burden of establishing, even by a preponderance of the evidence, that the plaintiff ever acquired or became eligible to obtain an award of value through bankruptcy proceedings involving any of the TAI corporations, nor that he earned income from these businesses, such as might have been available to him for use in complying with the orders of June 3, 1993. The court cannot therefore find that the plaintiff wilfully failed to comply with the order requiring "that any and all payments the plaintiff receives from the bankruptcy of TAI Industries be used to pay the arrearage owed to the defendant." Memorandum of Decision (June 3, 1993). Accordingly, this aspect of the defendant's motion for contempt #167 is denied.
 2 FUNDS AVAILABLE FROM DEBORAH BOWERS AND OTHER CREDITORS
In further support of her motion for contempt #167, the defendant claimed that the plaintiff's wife, Deborah Bowers, was used as a reservoir for the wilful and fraudulent concealment of assets or income that the plaintiff should have used to pay the CT Page 16479 amounts specified in the orders of June 3, 1993. While the defendant examined the plaintiff at length concerning Deborah Bowers's earnings and employment history, the court has found an insufficient basis for crediting this claim.
From the evidence presented, the court has concluded that since 1993, Deborah Bowers has been primarily employed as a school teacher: she has also acquired additional income through work with her family's real estate business. As noted, Deborah Bowers, has paid the great majority of the defendant's expenses, and has financially supported her husband.[33] The plaintiff has used credit card accounts issued in his name, but for which his wife, Deborah Bowers, is financially responsible. Nonetheless, the evidence was insufficient, however, to reasonably permit the court to conclude that Deborah Bowers has made any regular gifts or contributions, of specific amounts, to the plaintiff's support. Accordingly, there was insufficient evidence from which the court could conclude that this marital arrangement constituted the plaintiff's wilful obfuscation of his personal assets, income or ability to pay amounts due to the defendant pursuant to the orders of June 3, 1993. Unkelbach v.McNary, 244 Conn. 350, 365, 710 A.2d 717 (1998).
The defendant introduced extensive evidence concerning the checking accounts utilized by the plaintiff and Deborah Bowers during late 1992 and 1993, in an effort to show that they had commingled their funds with those ostensibly belonging to TAI Systems, Inc.[34] The financial transactions demonstrated that Deborah Bowers accepted funds from those vendors to whom TAI Systems, Inc. had rendered services, and that she further wrote checks from her account for direct deposit to accounts maintained for TAI Systems, Inc. In 1993, approximately $ 97,500 was demonstrated to have been deposited to Deborah Bowers's account at Barnett Bank. Between January and June of 1993, approximately $ 95,000 was withdrawn from this account, and deposited into the accounts maintained in the name of TAI Systems, Inc. Without approving of the process, the court credits the plaintiff's explanation that this deposit-and-withdrawal system was utilized in an effort to protect the income earned by TAI Systems Inc. from any creditors of the failing TAI Industries, Inc., then in the bankruptcy process. Again, however, this evidence does not permit the court to conclude that the plaintiff constructively or actually accrued funds through this checking-account strategy. C. Tait and J. LaPlante, supra, § 8.2.4, p. 230. CT Page 16480
The defendant further proposed that the court should draw the conclusion that TAI Systems, Inc. provided compensation to Deborah Bowers lieu of payments to the plaintiff. During the 1993 calendar year, Deborah Bowers worked for TAI Systems, Inc., and received approximately $ 40,000 as compensation. The court credits the plaintiff's testimony to the effect that Deborah Bowers earned this income by organizing and staffing trade shows in which TAI Systems, Inc. participated, serving as a spokesperson for the enterprise, and demonstrating its wares and services. This income was supplemented by her work as a teacher and in real estate, allowing her to accumulate a gross total of $ 60,000 in income for that year. As noted above, however, the defendant has failed to demonstrate that this income, earned by Deborah Bowers, provided the plaintiff with funds appropriate allocable to payment of the outstanding arrearage, due costs or attorney's fees. Compare Unkelbach V. McNary, supra,244 Conn. 365.
In a further effort to show that the plaintiff had accrued sources of funding for payment of the court-ordered arrearage, fees and costs, the defendant presented evidence related to the plaintiff's work outside the telecommunications industry. The defendant submitted that the plaintiff was owed a substantial amount of money by a boxer, Marlon Starling, for whom he had provided management services. The plaintiff admitted that he had brought suit against Starling to recoup fees due pursuant to his management contract, and that the litigation had been recently settled. The plaintiff's testimony on the subject merely disclosed, however, that while he might be entitled to receive $ 20,000 from Starling, this amount was subject to Starling's outstanding debts to the IRS. The court was therefore not provided with evidence from which it could reasonably conclude that this settlement represented a collectable judgment in favor of the plaintiff, nor that any such judgment in the plaintiff's favor would likely provide a reasonable source of payment for court-ordered debts owed to the defendant. Thus, the defendant's presentation of evidence related to the plaintiff's alternate sources of income fails to yield, even by a preponderance of the evidence, a lawful basis for granting her motion for contempt #167.
 3 FUNDS AVAILABLE THROUGH THE ESTATE OF MARIE BOWERS
CT Page 16481
In additional support of her motion for contempt #167, the defendant claimed that in 1994, while the plaintiff had funds available to honor Judge Norko's orders in full, he wilfully failed to advise her that he was in a position to comply with these orders, and wilfully failed to pay the amounts established as due to her on June 3, 1993. The court finds that these funds would indeed have provided an adequate resource from which the defendant could have been paid the entirety of the due arrearage, along with the outstanding costs and attorney's fees. The plaintiff's failure to utilize these available funds to pay the defendant constituted a wilful refusal to comply with the orders of obligation imposed on June 3, 1993. Eldridge V. Eldridge, supra, 244 Conn. 529, 532. For this wilful refusal to comply when he was clearly able to do so, the court finds the plaintiff in contempt, pursuant to this issue as raised within the context of the defendant's motion #167.
The court has made the following additional findings of fact, pertinent to this aspect of the defendant's motion for contempt:
The plaintiff's mother, Marie Bowers, had died on July 3, 1994. The plaintiff and his brother, William Bowers, served as co-executors of the decedent's estate. The plaintiff received timely notification that he was eligible to receive a monetary distribution from his mother's estate, totaling at least eighteen-thousand five hundred dollars. The plaintiff never volunteered this information to the defendant. However, having learned from other sources that Marie Bowers had left a solvent estate, the defendant obtained access to Probate Court records which identified this anticipated distribution. The defendant subsequently consulted with two attorneys in August of 1994 to ascertain how she could access the funds held in the probate account, for purposes of perfecting the plaintiff's child support obligation to her, all without success.
The court credits the defendant's explanation that he never received a direct distribution of these funds from his mother's estate. Rather, he utilized the identified inheritance to repay a portion of a loan he had obtained from his brother and co-executor, William Bowers. However, this loan had been extended to the plaintiff in April of 1994, after the entry of Judge Norko's orders. In December of 1994, the defendant executed a formal notification of his intention to disclaim any benefits from his mother's estate, in exchange for William Bowers' consideration in forgiving a portion of the loan. The plaintiff CT Page 16482 thus did not use the available inheritance to pay the amounts due to the defendant, but improperly diverted these funds and used them for an unrelated purpose, outside the scope of the extant court orders.
Here the defendant has established, by clear and convincing evidence, that in 1994, the plaintiff had access to funds sufficient to address his court-ordered debts to the defendant. The evidence unequivocally demonstrates that the plaintiff wilfully elected to forgo his obligation to the defendant, bypassing the June 3, 1993 orders and honoring instead a lately-incurred obligation to his brother. This, "[t]his is not a case in which the [plaintiff] did not have the ability to comply. Rather, he chose not to." Eldridge v. Eldridge, supra,244 Conn. 532. Insofar as this issue is concerned, the plaintiff has not established that he could not comply with the orders of June 3, 1993, or that he was unable to do so. Id., citing Bunche v.Bunche, supra, 36 Conn. App. 325 and Zivic v. Zivic,26 Conn. App. 5, 10, 596 A.2d 475 (1991). Compare Mallory v. Mallory, supra, 207 Conn. 57. By diverting funds available to him from the estate of Marie Bowers, the court finds, upon the clear and convincing evidence presented, that the plaintiff acted in contempt of Judge Norko's orders which had identified the outstanding arrearage, attorneys fees, and costs owed to the defendant and imposed upon him the obligation to pay these liquidated amounts when he was able to do so. Having violated this order, the court finds the plaintiff in contempt, and grants the defendant's motion for contempt #167.
 B ORDERS OF MARCH 26, 1996 AND DETERMINATION OF PLAINTIFF'S EARNING CAPACITY
The remaining issues center upon the plaintiff's ability to make payments to the defendant in honor of Judge Norko's findings of June 3, 1993 by way of the interim orders issued on March 26, 1996. The plaintiff has both contested the grounds or validity for the entry of the June 3, 1993 orders and argued that he simply has been unable to pay the defendant the sums their identified as due to her. Hence, this section will address the defendant's motion for contempt #177, based on the plaintiff's non-compliance with the interim orders, and the plaintiff's motion to modify the relevant payment orders issued by the court. CT Page 16483
By way of history, on March 26, 1996, "[u]pon finding . . . that the plaintiff has deliberately avoided finding employment," this court had entered orders which were directed at perfecting the plaintiff's compliance with the orders of June 3, 1993. Orders of March 26, 1996.[35] See Gentile v. Ives, supra.,163 Conn. 281. These compliance orders included a specific provision that the plaintiff was "to find work and remain employed", and scheduled installment payments plus a provision for the plaintiff's tender of interest to the defendant if he should fail to make timely payments.[36] Orders of March 26, 1996.
Through her motion for contempt #177, submitted under date of May 2, 1996, the defendant claimed that the plaintiff, while able to do so, wilfully refused to comply with the court's interim order for installment payments, and further asserted that in the weeks following the entry of the orders of March 26, 1996, the plaintiff failed to make efforts at securing employment as he had been ordered to do.[37] In response, the plaintiff submitted his motion to modify under date of July 18, 1996,[38]
explaining that he had not complied with the interim orders because of his inability to secure appropriate employment, ostensibly due to the lack of work in the southern region of the United States where he had chosen to live, and also due to his asserted physical disabilities. The plaintiff also argued that the absence of a current financial affidavit barred the court from entering any financial orders in effectuation of Judge Norko's rulings on June 3, 1993.[39] The plaintiff did not raise, but the court must here note, the probability that the interim financial orders exceeded the scope of the then-existing child support arrearage guidelines.[40]
Generally, "`[a]n order of the court must be obeyed until it has been modified or successfully challenged. See Fox v. FirstBank, 198 Conn. 34, 30 n. 3, 501 a.2d 747 (1985).' Jaconski v.AMF, Inc., 208 Conn. 230, 234-35, 543 a.2d 728 (1988)." Eldridgev. Eldridge, supra, 244 Conn. 530. In this matter, however, in response to the plaintiff's assertions of physical disabilities, the court's orders of March 26, 1996 were suspended from December 3, 1996 through February 3, 1997, when hearing of the matter was scheduled to recommence. The court file does not reflect that the interim compliance orders were ever reinstated when the hearing recommenced on February 4, 1997 or thereafter. Therefore, insofar as these issues are concerned, the court's attention must be narrowly focused upon the issue of whether the plaintiff displayed contumacious behavior prior to the defendant's CT Page 16484 submission of her motion for contempt #177, and whether the plaintiff had, at relevant times, demonstrated the capacity to earn income sufficient to comply with the findings and orders entered on June 3, 1993. Eldridge v. Eldridge, supra,24 Conn. 529. Given these parameters, the evidence in this matter supports the conclusion that the plaintiff wilfully failed to make duly diligent efforts to "find work and remain employed", in violation of the interim orders. The plaintiff was given generous opportunities to prove the physical disabilities by which he claimed to be affected, but the evidence was sufficient only to warrant the finding that he was unable to perform heavy manual labor. Under all these circumstances, the court finds that the defendant has proved, by clear and convincing evidence, that the plaintiff has been able to work, has elected not to work, and thus wilfully has left her without the reasonable payment of court-ordered obligations to which she is entitled. Eldridge v.Eldridge, supra, 244 Conn. 532. Accordingly, the court finds the plaintiff in contempt of court for failure to comply with the interim orders, and grants the defendant's time-limited motion for contempt #177. The court denies the plaintiff's motion to modify, and has entered further orders directed at fulfillment of Judge Norko's assessments as recorded on June 3, 1993.
From the evidence presented, the court finds the additional pertinent facts:
As noted, from 1993 forward, the plaintiff was without employment for substantial periods of time. His efforts to secure a position he considered to be appropriate for his skills and experience were desultory and unsuccessful. The plaintiff had "called on" a number of companies in the telecommunications field, had "networked" within this industry, and had utilized "headhunting" services, as well as governmental employment agencies, largely self-limiting his job search to the specific field of communications technology. Under the circumstances of this case, the court cannot reasonably credit the plaintiff's explanations that the only income-producing work he had been able to obtain was through intermittent tutoring jobs and a brief stint as a construction laborer, all of which prevented his ability to obey the court order. Eldridge v. Eldridge,244 Conn. 531-32.
The plaintiff's talents and skills in the field of communications have been noted elsewhere in this opinion. The plaintiff admitted that he believes himself capable of performing CT Page 16485 work which would make good use of his management skills and executive experience, although he insists that no such work is available to him. The plaintiff is a veteran of service in the United States Army, having served from 1964-1967. From 1989 through 1992, he was a full-time student at Jones College in Jacksonville, Florida, earning his B.S. in the field of Marketing Management. The plaintiff has also taken post-graduate courses in mathematics and computer science in his effort to achieve his stated goal of leaving the telecommunications industry to work as a certified math teacher. The plaintiff admitted that he had obtained some work as a tutor, with students obtained from private sources as well as through school referrals: he has been able to earn $ 10 per hour for this service. Under the totality of the circumstances here presented, it would be again disingenuous for the court to infer that with such talents, the plaintiff is intrinsically unemployable.
In an effort to establish an acceptable basis for his non-compliance with the court's interim orders, the plaintiff presented evidence relating to his medical condition.[41] The plaintiff's evidence established that he had been treated by a physician who has recommended regular cardiac testing and limitation of strenuous physical activity in view of noted coronary irregularities: the plaintiff had, however, avoided the recommended medical attention, claiming financial hardship. The plaintiff also presented evidence that he had unsuccessfully attempted to work as a laborer in construction jobs. The court credits the plaintiff's claim that his medical status effectively precludes him from performing such work or from engaging in other physically intensive positions. However, the court received no credible evidence from which it could reasonably conclude that either the plaintiff's cardiologist or any other doctor had prohibited him from engaging in the occupations such as those demanding the ability to participate in repartee and written interchange which he executed so well in the courtroom during the course of these proceedings. Indeed, the plaintiff has admitted that his cardiac status would not prevent him from completing his teacher-training program, nor from engaging in the rigorous field of classroom teaching. Furthermore, he has candidly admitted that there is no valid reason why he cannot work at a minimum wage job, other than that of a laborer. Thus, while the court thus accepts the plaintiff's complaint that he has had chest pains and that he has received medical attention for the conditions that caused this pain, the evidence as a whole does not permit the court to conclude that he is so overwhelmingly disabled by CT Page 16486 cardiac disease as to be prevented from working in any meaningful capacity.
In addition to his cardiac condition, the plaintiff claimed that in 1993 he sustained an injury to his head, which led him to suffer nausea, dizziness and memory loss. The plaintiff admitted that, notwithstanding all of his medical conditions, he had been able to successfully participate in an internship program, performing perform student-teaching activities three days a week. Additionally, at the hearings of these matters, the plaintiff appeared to have clear and complete recall of the relevant issues raised in direct or cross-examination. He was able to present his evidence in an organized and polished manner, again evincing his ability to prepare for courtroom interaction and to communicate effectively. Under these circumstances, the court finds the plaintiff's head injury to serve as an inadequate explanation for his failure to find and maintain employment.
The court has considered the evidence presented by the plaintiff in support of his claim that he is entitled to a modification of the interim orders because he is medically unable to perform any work, even that which would render him eligible for compensation at a minimum wage level. State v. Santiago, supra, 245 Conn. 318; Smith v. Smith, supra, 183 Conn. 123. The evidence supports the reasonable conclusion that by self-limiting his employment search, the plaintiff tactically sabotaged his chances of finding remunerative employment, and thus wilfully evaded application of the court's orders. See Paddock v. Paddock, supra, 227 Conn. 371; Lawler v. Lawler, supra, 16 Conn. App. 204. The court ascribes little weight to the plaintiff's complaint that no acceptable remunerative work is available him in the area of the United States where he and his wife have chosen to live.
The plaintiff seeking modification of the interim orders, bore the burden of proving a substantial change in circumstances from those existing on March 26, 1996, when the interim orders were imposed, through July 18, 1996, when his motion for modification was submitted to the court. Shearn v. Shearn, supra,50 Conn. App. 229-30. The evidence presented fails to support the plaintiff's claim that there had been a substantial change in circumstances during this period, nor that any substantial change in circumstances had existed from the date when the June 3, 1993 orders were entered, through the date of the conclusion of this hearing. During all relevant periods, the defendant was, by his own choice, without measurable, gainful employment, although he CT Page 16487 remained eminently employable. From the evidence presented, and the reasonable and logical inferences drawn from based on the facts proven, the court finds that the plaintiff has failed to meet his burden of showing, even by a preponderance of the evidence that he was unable to earn a minimum wage from March 26, 1996 through May 2, 1996, the time period placed at issue through the defendant's motion for contempt #177.
The interim orders had been entered after four full, extended days of hearing, in which the plaintiff participated fully, vigorously presenting his case in a near-professional manner notwithstanding his status as a non-attorney, pro-se litigant with a history of a head injury. Despite his vociferous protestations that thereafter a cardiac condition compromised his ability to work, the plaintiff fully participated in seven subsequent days of intensive direct and cross-examination in this matter, again serving as his own counsel. Under all the circumstances that have been presented in this case, the plaintiff cannot be found to have met his burden of proving that any substantial change in his employability and attendant circumstances had occurred from June 3, 1993 through the close of the evidence in these matters. Under all the circumstances here presented, the court to finds that the plaintiff has demonstrated an ability to work, and to perform well, even under demanding circumstances, and to earn at least a minimum wage. In the face of such ability to earn income, the absence of evidence indicating the plaintiff's actual income does not diminish the court's authority to impose financial obligations upon the plaintiff. Lucy v. Lucy, supra. 183 Conn. 234; Schmidt v.Schmidt, supra, 180 Conn. 189; Carey v. Carey, supra,29 Conn. App. 440.
As the evidence supports the conclusion that the plaintiff is able to work, and that he has failed to establish limitations on his earning capacity other than those related to strenuous physical labor, the court has applied the principles of Lucy v.Lucy, supra, 183 Conn. 234; Paddock v. Paddock, supra,22 Conn. App. 371; Lawler v. Lawler, supra, 16 Conn. App. 204; and Wilkensv. Wilkens, supra, 10 Conn. App. 580. The court thus fashioned financial orders on a determination of the plaintiff's capacity to earn at least a minimum wage, using his skills and experience, rather than through assessment of the plaintiff's actual earnings, and based upon appropriate application of the child support arrearage guidelines. Such determination is especially appropriate where, as here, there is a showing that the CT Page 16488 plaintiff's failure to obtain gainful employment was wilfully accomplished for the purpose of avoiding his obligation to pay the support arrearage, attorney's fees and costs previously assessed. The court's order can properly require the plaintiff "to continue to work or find other sources of income to meet the obligations of the court's order." Lawler v. Lawler, supra,16 Conn. App. 204.
The court notes that the plaintiff has met his burden of proving that he has been foreclosed from working in occupations that would require him to perform constant demanding physical labor, as may be found in the construction or landscaping fields. He has not, however, established that he is unable to perform sedentary or less physically taxing labor. Accordingly, no substantial change in circumstances having been established, the plaintiff's motion for modification of the March 26, 1996 orders is hereby denied. The defendant having further demonstrated, by clear and convincing evidence, that the plaintiff wilfully failed to fully comply with the interim orders for requiring him to find and maintain employment, so as to permit compliance with the June 3, 1996 orders establishing the child support arrearage, costs and fees, notwithstanding the fact that he was able to comply with those orders, the court grants the defendant's motion for contempt #177.
 IV ATTORNEY'S FEES AND COSTS
Absent reference to the attorneys fees and costs which were the subject of Judge Norko's orders, neither party has raised any specific claim for an award of counsel fees in relation to the pending motions.[42] General Statutes § 46b-87 provides that once contempt for failure to comply with orders has been found in a family matter, the court may sanction a noncomplying party through the award of attorney fees.[43] See Eldridge v.Eldridge, supra, 244 Conn. 234. "`[T]hat sanction may be imposed without balancing the parties' respective financial abilities.'" (External citation omitted.) Id. If the court concludes, after consideration of the parties' financial positions, "that denying an award of counsel fees would undermine its prior financial orders", then it may appropriately award counsel fees to the prevailing party in a contempt action. Issler v. Issler, supra,50 Conn. App. 71-72. CT Page 16489
In considering whether to award attorney's fees in this matter, the court has reviewed the evidence relating to all the motions that were the subject of this hearing, including the parties' financial affidavits and other evidence relating to actual income and earning capacity. The court finds that the evidence, in its entirety, was generally relevant to the court's determination of whether the plaintiff had the capacity to pay the defendant in accordance with Judge Norko's orders of June 3, 1993. There is no mathematical formula that could be utilized to distinguish which evidence was relevant, for instance, only to the matters raised through the defendant's motion to open judgments; to the issue of the plaintiff's access to funds available for use in compliance with the June 3, 1993 orders; to the plaintiff's ability to find and maintain employment; or to the plaintiff's motion for modification of the interim orders. As such, the court finds that on each of the eleven days of hearings related to the pending motions, it received evidence related to the two contempt motions, #167 and #177, on which the defendant has prevailed.
Appearing pro se, the plaintiff has not demanded payment of counsel fees in connection with those motions brought before the court in which he has prevailed, #176 and #178. The plaintiff did, however, submit an itemization of the costs and expenses he claimed to have incurred as the result of his appearances in court in Connecticut, requiring his travel by air or automobile from his home in Georgia to participate in these proceedings. Nonetheless, the plaintiff has not provided the court with a valid legal basis for awarding such relief as reimbursement of travel and lodging expenses.[44]
With regard to the defendant's motion to open judgment #178, the plaintiff specifically asserted an oral motion for costs to be paid if the court did not find due cause to open the judgments of April 15, 1988 or November 29, 1988 as had been requested. However, given the court's acknowledgment of jurisdiction over these matters, the court's denial of the plaintiff's motion to dismiss the motion to open judgment #178, and the noted basis for allowing presentation of the defendant's claims, the court declines the opportunity to grant the relief requested, notwithstanding the fact that the plaintiff has prevailed on these matters.
As to the defendant's motion for contempt #167, the court has found that the plaintiff had the ability to honor the orders of CT Page 16490 June 3, 1993 at the time he became entitled to a distribution from his mother's estate. For his wilful diversion of those funds which would otherwise have been available to pay the defendant the debt due, and for his wilful failure to comply with the orders of June 3, 1993, the court has found the plaintiff in contempt. The defendant did not specifically request an award of attorney's fees in connection with motion for contempt #167, again asking only that the plaintiff be "punished" for his contumacious behavior. Under these circumstances, recognizing the plaintiff's prior avoidance of his obligation to pay the defendant when he was able to do so, the court finds that a denial of the defendant's statutory opportunity to collect at least a portion of her attorney's fees would, in a substantial way, "impair or undermine the other financial orders entered" by Judge Norko. (Footnote omitted.) Issler v. Issler, supra,50 Conn. App. 72. Under these circumstances, the court again finds that an award of attorney's fees, within the purview of General Statutes § 46b-87, constitutes appropriate remedy for contempt of this court order.
As to the motion for contempt #177, the court has found these issues in the defendant-movant's favor, noting the plaintiff's wilful violation of the March 26, 1996 orders to find and maintain employment. While the defendant did not specifically request an award of attorney's fees, she did demand, in her prayer for relief, that the plaintiff should be "punished" for his contempt of court orders. Here again the court finds that a denial of the defendant's statutory opportunity to collect at least a portion of her attorney's fees would, in a substantial way, "impair or undermine" the interim compliance orders entered by the court. An award of attorney's fees, within the purview of General Statutes § 46b-87, constitutes appropriate remedy for contempt of a court order under these circumstances, as well.Issler v. Issler, supra, 50 Conn. App. 72.
In determining whether to award attorney's fees to the defendant in connection with contempt motions #167 and #177, the court has also considered the implications of the plaintiff's motion for modification, dated July 18, 1996. This motion, which was denied after hearing, raised issues of earning capacity, income, access to funds, employment status, and the plaintiff's health, all of which, as noted, were equally pertinent to the defendant's motions for contempt #167 and #177. The hearing of these motions, including specific attention devoted to the plaintiff's claims of medical disability, required the better CT Page 16491 portion of at least seven days of hearings. Accordingly, the defendant having prevailed in these matters, the court finds $ 4,550.00 to constitute a reasonable attorney's fee in connection with these motions; $ 3,900.00 related to the defendant's motion #167, based upon the plaintiff's election not to utilize an available asset when he had the opportunity to honor Judge Norko's orders in full, and $ 650 related to the defendant's motion #177, based upon the plaintiff's failure to comply with the interim orders between March 26, 1996 and the submission of the motion for contempt under date of May 2, 1996.[45]
 V ORDERS
WHEREUPON, having made the above findings of fact and having adjudicated the plaintiff in contempt of court insofar as the issues raised by the defendant's motions #167 and #177 are concerned, the court issues the following remedial orders:
A. The court requires the plaintiff to "work or find other sources of income to meet the obligations of the court's order" as set forth below. Lawler v. Lawler, supra, 16 Conn. App. 204. The plaintiff is accordingly ordered to find and/or maintain full-time, lawful and remunerative employment, other than that requiring intensive physical labor; to work at this employment for a minimum of thirty five hour per week; to do nothing that would jeopardize that employment; and to maintain and preserve all paystubs, automatic deposit acknowledgements, or other indicia of wages delivered to him by his employer. If the plaintiff is not currently employed on a full-time basis, he is ordered to spend a minimum of thirty hours per week actively searching for full-time employment, and is further ordered to document, in writing, each effort made to obtain full-time employment during his thirty hour per week time allotment. Upon written request from the defendant and/or her counsel, the plaintiff is to provide written verification of his employment status, and/or photocopies of his written documentation of his search for full-time employment.
B. As established by the orders of June 3, 1993, the plaintiff is required to play the defendant the child support arrearage in the amount of $ 11,844.00, counsel fees in the amount of $ 5055.00, and costs of $ 919.93, for a total gross amount of $ 17,818.93, utilizing the schedule of installment CT Page 16492 payments set forth below. LaBow v. LaBow, supra,13 Conn. App. 350 The plaintiff is entitled to a credit of $ 1,087.22, representing the total amount presented to this court as having been paid against the child support arrearage orders, in honor of the orders of June 3, 1993. Thus, the net amount due to the defendant, in effectuation of these orders, is $ 16,731.71.[46]
 C. Having found the plaintiff in contempt after hearing of the defendant's motions #167 and #177, the court has now ordered him to pay an additional $ 4,550.00 as attorney's fees. The total amount due from the plaintiff to the defendant is thus $ 21,281.71, of which $ 10,524.93 represents attorney's fees and costs.[47]
 D. The court has found that the plaintiff is at least capable of earning a minimum wage, and has acknowledged the plaintiff's elected lifestyle and persistent financial dependence upon his current wife. In fashioning an appropriate schedule of payments to facilitate the defendant's receipt of the arrearage amount, the court is nonetheless obligated to utilize the arrearage sections of the child support guidelines, concerning imputed support obligations for children who are no longer minors, in the absence of specific evidence permitting application of the deviation criteria supported by § 46b-215a-3(b)(1)(d). Accordingly, the court orders that the plaintiff pay the defendant $ 125.00 per month against the established child support arrearage of $ 11,844.00, less the $ 1,087.22 credit noted above, leaving a net child support arrearage of $ 10,756.78. In addition, the plaintiff is required to pay the defendant $ 325.00 per month against the total amount of $ 10,524.93 representing outstanding attorney's fees and costs.
E. The court further orders that the plaintiff make these payments to the defendant against the child support arrearage, attorney's fees and costs due, in the total amount of $ 450.00 per month, by sending to her a valid bank check or money order for that amount, made payable to the defendant, on the last day of each month, by certified U.S. mail. These payments shall commence on January 31, 2000. The plaintiff shall be responsible for maintaining receipts and documentation of these transmittals, which shall continue until the entire due amount of $ 21,281.71 has been paid to the defendant.[48]
 F. The plaintiff is further ordered to pay the defendant simple interest on any unpaid portion of the monthly installments CT Page 16493 due, at the rate of ten per cent per year, the appropriate interest rate in family matters, as established by General Statutes § 37-3a. Ford v. Ford, supra, 41 Conn. Sup. 540; 7 Connecticut Practice Series: Family Law and Practice 1991 (1998 Pocket Part), supra, § 33.27.
G. These provisions shall in no way limit the plaintiff from accelerating those payments which are due to the defendant, for upon fulfillment of his total obligation, the effect of the orders for installment payments shall cease.
H. To facilitate review of these matters, and to enable the parties to file timely motions for modification and/or contempt related to these proceedings, the plaintiff is hereby ordered to provide the defendant with a copy of each state and federal tax return, request for extension and/or payment he makes during each calendar year, including personal income tax returns and estimated tax payments, accompanied by copies of applicable W-2 and/or 1099 forms, until the until the entire due amount of $ 21,281.71, plus any applicable interest, has been paid to the defendant. These tax returns and/or payments shall be accompanied by a copy of each W-2 and 1099 form reflecting the defendant's income and employment status in each year. These tax returns and/or payments shall be tendered to the defendant by deposit into U.S. certified mail no later than the thirtieth day of April in each year when the plaintiff's income tax returns are filed by April fifteenth, and no later than October thirtieth in any year when the maximum extension, until October fifteenth, has been granted by the Internal Revenue Service to allow the plaintiff to delay submission of his federal tax returns.
WHEREUPON, THESE MATTERS HAVING BEEN HEARD, THE FOREGOING ORDERS ARE ENTERED.
BY THE COURT,
N. Rubinow, J.